AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| CARALYNN CUMMINGS, | |
| Defendant(s) | |

**LODGED**
CLERK, U.S. DISTRICT COURT

**1/18/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jb _____ DEPUTY

Case No.      2:22mj201-duty

**FILED**
CLERK, U.S. DISTRICT COURT

1/18/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: __bm__ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between the date(s) of September 11, 2018, and July 13, 2021, in the county of Los Angeles in the Central

District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of an Unauthorized Access Device |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Alfredo Rossi*
*Complainant's signature*

_____
**Alfredo Rossi, HSI Special Agent**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   January 18, 2022

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lynda Lao (x7167)

## AFFIDAVIT

I, Alfredo Rossi, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since June 2019.  I am currently assigned to the El Camino Real Financial Crimes Task Force, where I investigate matters concerning bank fraud, wire fraud, identity theft, money laundering, and other illegal financial transactions.

2.   Prior to becoming a Special Agent with HSI, I was employed as a Special Agent with the United States Secret Service ("USSS") from June 2016 until June 2019, where I was responsible for the investigation of various types of theft and fraud, including the manufacturing of counterfeit and fraudulent identification documents, and the investigation of financial crimes (such as access device crimes, credit card fraud, check fraud, and schemes to conceal and launder the proceeds of such crimes).

3.   To become an HSI Special Agent, I completed 9 months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  During my employment as an HSI and USSS Special Agent, I have participated in various aspects of criminal investigations, including bank records analysis, telephone records analysis, electronic surveillance, physical surveillance, search warrants, arrests, and reviewing evidence from digital devices.  I have also spoken to many law

enforcement agents regarding their experience in criminal investigations, interviewed defendants, confidential informants, and witnesses who had personal knowledge regarding the methods used to commit various types of criminal offenses.

## II. **PURPOSE OF AFFIDAVIT**

4.   This affidavit is made in support of a criminal complaint and arrest warrant against **CARALYNN CUMMINGS** for a violation of Title 18, United States Code, Section 1029(a)(2) (Use of an Unauthorized Access Device).

5.   This affidavit is also made in support of applications for warrants to search the following:

a.   4236 W 129th Street, Unit B, Hawthorne, California 90250 (the "**SUBJECT PREMISES**"), as described more fully in Attachment A-1;

b.   The person of **CUMMINGS** as described in Attachment A-2; and

c.   The person of **ANTHONY TRUJILLO** as described in Attachment A-3.

6.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 1028A(a)(1) (Aggravated Identity Theft), 1029(a) (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), 1956 (Money Laundering), and 2315 (Sale of Stolen Goods) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

8.    **CUMMINGS** unlawfully used S.C.'s American Express credit card to purchase at least $521,565.27 in merchandise from a Los Angeles-based online service, FabFitFun, between September 2018 and July 2021, without authorization.  Most of the merchandise was ordered via the internet, and mailed to **CUMMINGS'**s residences, including the **SUBJECT PREMISES**, where she currently resides with **TRUJILLO** and their children.

### IV.   STATEMENT OF PROBABLE CAUSE

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   S.C. Discovers Fraudulent Purchases from FabFitFun

10.    On or about August 24, 2021, I was notified by American Express ("AMEX")[1] that on July 20, 2021, S.C. called

---

[1] Based on my review of AMEX's website, I am aware that AMEX is a credit card company that is headquartered in New York, New York.  See https://ir.americanexpress.com/resources/our-contactinformation/default.aspx (last visited January 10, 2022).

AMEX to report fraudulent purchases made using his AMEX credit card. S.C. said that he discovered several unauthorized purchases, totaling at least $521,565.27, from a Los Angeles-based online merchant, FabFitFun,[2] when he reviewed his statements with his business manager. The purchases were made between September 11, 2018, and July 13, 2021, and varied in amounts, ranging from $107.86 to $39,393.79.

**B.   CUMMINGS Billed and Mailed Fraudulently Purchased FabFitFun Merchandise to the SUBJECT PREMISES**

11.   Based on my review of FabFitFun invoices for purchases made using S.C.'s AMEX credit card, I am aware of the following:

a.   S.C.'s AMEX card was used for at least 325 purchases between September 11, 2018, and July 13, 2021. The purchases were for a variety of products, including beauty products, electronics, coffee mugs, health supplements, linens, clothes, kitchenware, and workout equipment. For example, on or about June 8, 2021, S.C.'s AMEX card was used to purchase more than 170 various products for a total of $24,054.19.

b.   Each of the 325 purchases was made using a FabFitFun user account in the name of "C. Lynn" with email address islandsmademe@gmail.com.

c.   Between September 2018 and March 2021, the billing address associated with 241 of the 325 purchases was 3924 W 113th Street, Apartment 3, Inglewood, California (the

---

[2] Based on my review of FabFitFun's website, I am aware that FabFitFun is an online merchant located in Los Angeles, California. FabFitFun sells a variety of beauty, fashion, fitness, wellness, home, and tech products through subscription services and one-off direct sales. See https://fabfitfun.com (last visited January 5, 2022).

"Inglewood apartment"). On or about March 18, 2021, the billing address was changed from the Inglewood apartment to the **SUBJECT PREMISES**.

      d.   Between September 2018 and March 2021, approximately 112 of the orders were shipped to the Inglewood apartment. Approximately 14 additional orders made during this time period were mailed to various other addresses in Washington state.

      e.   Between March 2021 and July 13, 2021, approximately 77 of the orders were shipped to the **SUBJECT PREMISES**, instead of the Inglewood apartment. Based on information obtained from the United States Postal Service on or about September 17, 2021, I know that **CUMMINGS** had started receiving mail at the **SUBJECT PREMISES** in on around March 2021, and that the postal carrier assigned to that route had observed a couple moving in at the **SUBJECT PREMISES** around the same time.

    12.  During my review of FabFitFun records related to the unauthorized purchases made using S.C.'s AMEX credit card, I viewed a log of calls made to FabFitFun related to the unauthorized purchases. According to the logs, the phone number 310-220-5502 was used to inquire about a purchase made using S.C.'s AMEX credit card. I queried the phone number in Accurint[3] and learned that the phone number is registered to **CUMMINGS**.

    13.  I listened to recordings of two phone calls made to Fabfitfun on December 4 and 5, 2020, in which the caller -- who

---

[3] Accurint is a service available to law enforcement that searches public and private databases for telephone number subscriber information.

I believe to be **CUMMINGS** -- identified herself by name as "C Lynn" and inquired about the Fabfitfun account associated with islandsmademe@gmail.com.  During the calls, **CUMMINGS** asked about the status of an $8,000 order that was mistakenly shipped to an address in Washington rather than her address in Inglewood, California (the Inglewood apartment).

14.   Based on my review of the FabFitFun records, in particular the types and quantities of the items purchased, I do not believe that **CUMMINGS** maintained the items for personal use and suspect that they resold the goods, likely for a discounted rate.  For example, on or about June 29, 2021, over 250 individual items were purchased using S.C.'s card ranging from furniture, cosmetics, clothing, flash drives, notepads, towels, workout equipment, pillowcases, and supplements.

C.   **CUMMINGS, TRUJILLO, and A.H. Currently Reside at the SUBJECT PREMISES**

15.   I reviewed California Department of Motor Vehicles ("DMV") records and learned that **CUMMINGS** listed the Inglewood apartment as her address of record on or about January 25, 2021.

16.   I also noticed that **CUMMINGS**'s first name, CARALYNN, appeared to be a non-abbreviated version of C. Lynn, the accountholder of the FabFitFun user account associated with the fraudulent purchases made using S.C.'s AMEX credit card.

17.   On September 17, 2021, the United States Postal Inspection Service notified me that, as of that date, the recipients of mail at the **SUBJECT PREMISES** were **CUMMINGS** and an individual with initials A.H.

18.   I reviewed lease documents for the **SUBJECT PREMISES** and found that A.H. is listed as the lessee of the **SUBJECT PREMISES**.   I also reviewed an email that was sent to the property manager to initiate the lease that included A.H.'s passport and social security numbers.   In addition, as part of the lease application process, A.H. provided paystubs indicating that she was employed by Aloha Limousine Services — the same place where **CUMMINGS** is also employed and where I believe **CUMMINGS** obtained S.C.'s AMEX credit card information, as described further below.

19.   I reviewed California Employment Development Department ("EDD") records and learned that **CUMMINGS** lists the **SUBJECT PREMISES** as her address of record.   I also learned from EDD records that **TRUJILLO** reports the **SUBJECT PREMISES** as his address of record.   Based on my review of a California Department of Children and Family Services Bureau report dated September 7, 2018, I believe that **TRUJILLO** and **CUMMINGS** share at least three children who also reside at the **SUBJECT PREMISES**.

**D.    Attempts to Speak with TRUJILLO at the SUBJECT PREMISES**

20.   On September 8, 2021, I attempted to contact the residents of the **SUBJECT PREMISES** with another agent.   An adult male, later identified as **TRUJILLO**, met us at the door with his minor son.   Both **TRUJILLO** and the child exited the **SUBJECT PREMISES** to speak with us.   **TRUJILLO** told us his name was "Jack" and that he had lived at the **SUBJECT PREMISES** for no more than two months.

21.   I told **TRUJILLO** that I was investigating mail theft in the neighborhood and asked him if he had noticed any such activity.  **TRUJILLO** denied receiving mail at the **SUBJECT PREMISES**, but I later saw **TRUJILLO** use a key to access a mailbox containing what I recognized to be unopened mail, in contrast to his earlier statement.  After I asked **TRUJILLO** if he could show us a copy of the lease for the **SUBJECT PREMISES** so that we could identify the property management company, **TRUJILLO** walked inside the unit and came out a few seconds later empty-handed.  He then asked the agents about the real reason for their visit and became confrontational.

22.   To avoid any further confrontation, I provided **TRUJILLO** with my business card and asked him to contact me if he had any additional information.  Another agent placed a business card at the door of one of the neighboring units.  Later that day, I reviewed **TRUJILLO**'s DMV photo and recognized "Jack" as **TRUJILLO**.  Based on my investigation and training and experience, I believe that **TRUJILLO** provided the name "Jack" to conceal his identity.

23.   When I returned to the **SUBJECT PREMISES** on September 10, 2021, I spoke to the tenant who lived in the neighboring unit and he/she said that he/she never received the business card that was left at his/her door.  Another agent and I showed the tenant DMV photos of **CUMMINGS** and A.H.  The tenant stated that he/she had seen **CUMMINGS** at the **SUBJECT PREMISES** on various occasions but had never seen A.H.

### E.    CUMMINGS's Employment at Aloha Limousine Service

24.    I spoke with S.C. by phone on September 9, 2021.  S.C. told me that he had never purchased anything from FabFitFun and had no prior knowledge of the company.  S.C. did not recognize the names of **CUMMINGS** or **TRUJILLO** and said that neither were authorized to make purchases using his AMEX credit card.

25.    About 20 minutes after my September 2021 call with S.C., S.C. called me back and told me that he searched for **CUMMINGS** on the internet and found a LinkedIn profile indicating that **CUMMINGS** was a professional driver employed at Aloha Limousine Services.[4]  S.C. said that he and his wife regularly used Aloha Limousine Services for the past 10 to 12 years.  He added that Aloha Limousine Services and its employees would have had access to his AMEX credit card information.  S.C. was not familiar with all of the Aloha Limousine Services drivers and said it was possible that **CUMMINGS** might have been his driver on at least some occasions.

26.    The Hawthorne Police Department issued **CUMMINGS** a citation on July 7, 2010, for failing to present a valid driver license while driving a limousine with California plate number "Aloah05".  According to California DMV records, that limousine is registered to Aloha Limousine Services.

---

[4] I later searched for and located the same LinkedIn profile page in **CUMMINGS**'s name.

27.   I reviewed open-source database, Data Lead,[5] an online portal that gathers information pertaining to companies registered in the United States and their employees, which indicates that **CUMMINGS** was employed at Aloha Limousine Services beginning no later than January 22, 2021.

### E.   Identification of CUMMINGS and TRUJILLO as the Users of islandsmademe@gmail.com

28.   On November 29, 2021, the Honorable Alexander F. MacKinnon, United States Magistrate Judge, authorized a warrant pursuant to 18 U.S.C. § 2703 for information associated islandsmademe@gmail.com.

29.   Based on my review of information I received from Google LLC pursuant to the order, I am aware of the following:

a.   The subscriber name for the account islandsmademe@gmail.com was listed as "Donald Duck".   Google Pay records associated with the islandsmademe@gmail.com listed the addresses of record as Pico Rivera, California, and Los Angeles, California, without more.

b.   The account received approximately 1,682 emails from FabFitFun, consisting of both advertisement emails and emails associated with product orders, including emails with FabFitFun customer service inquiring about order status.   For example, on December 4, 2020, the account (islandsmademe@gmail.com) was used to send the following message to vip@fabfitfun.com:

ORDER # 33876964

---

[5] Data Lead Combined is an online database that stores public information for over 19.5 million companies, including information about current employees.

$8448.94
this order is being shipped to wrong address please
help!!!! i have tried for days to get a response via
email, phone(which literally brought me to tears because
after 46min of waiting for the customer service agent to
help me in the slightest way, which still has not
happened and im still on hold waiting for a supervisor)
and i have received nothing. the problem is that i placed
a shop order. order # 33856483 on nov 28. and wanted it
shipped as a gift so after placing the order i noticed
shipping address was 3924 113th inglewood ca (our
regular shipping address) so i sent an email asking to
please ship order #33856483 to 1509 summitview ave #210
yakima wa. i received an response saying my request was
updated. I sent a 2nd email making sure that our account
shipping address was to remain the same 3924 113th
inglewood ca. I even went to our online account and sure
enough our shipping address had been updated to the
Washington address. I changed it back to the correct
address. Then i received emails that order # 33876964
totaling $8448.94 was shipping in multiple shipments to
1509 summitview ave #210 yakima WA.I am extremely upset
that this is happening but just speechless to the lack
of attentiveness this problem is receiving from FFF. I
spent 52 min on the phone (48 min of that on hold) with
a lady named sofia who couldn't get me a supervisor over
a period of 52 min and several requests for 1 because
every supervisor was in a meeting. YOU GUYS NEED TO DO
BETTER. THIS EXPERIENCE HAS BEEN A COMPLETE NIGHTMARE
FOR US. WE HAVE HAD A PLEASANT EXPERIENCE OVER THE YEARS
WITH FFF PLEASE LETS CONTINUE THAT AND GET THIS RESOLVED
ASAP. WE ARE REQUESTING ALL PACKAGESOTHER THAN ORDER #
33856483 NOT BE SENT TO 1509 SUMMITVIEW AVE #210 YAKIMA
WA . ALL PACKAGES EXCEPT ORDER # 33856483 SHOULD CONTINUE
TO SHIP TO SHIPPING ADDRESS 3924 113TH #3 INGLEWOOD CA
90303. A CONTACT # TO REACH ME IS 8088009132PLEASE HELP
US BEFORE ANY OTHER PACKAGES SHIP OUT TO WASHINGTON.I
NEED THESE FOR CHRISTMAS

      i. Based on my review of the email, and

listening to the corresponding phone call in which a woman I

believe to be **CUMMINGS** contacted FabFitFun customer service

regarding the shipment discussed above, I believe that **CUMMINGS**

inadvertently sent the shipment to the Washington address, where

she had sent a prior order.

c.    The islandsmademe@gmail.com account also received approximately 699 emails from Enspirecommerce (oms@enspirecommerce.com).  Based on my conversations with Enspirecommerce and FabFitFun employees, I am aware that Enspirecommerce is a fulfillment service that contracts with FabFitFun to provide shipment solutions to FabFitFun customers.

d.    The islandsmademe@gmail.com account received multiples emails from the California EDD.  I contacted the California EDD and learned that the account (islandsmademe@gmail.com) was associated with a request for unemployment insurance benefits in the name of J.P., who, based on my review of J.P.'s passport application, I believe to be **CUMMINGS'**s son.

e.    The islandsmademe@gmail.com account received three emails from WestStar Property Management, Inc. in March and October 2021 notifying the recipients that rent payments for those months was past due.  WestStar Property Management, Inc is the property management company associated with the **SUBJECT PREMISES**.

f.    The islandsmademe@gmail.com account also received multiple emails from Venmo that were addressed to **TRUJILLO**.

g.    The account was accessed from multiple digital devices, including android devices, cellular phones, and Linux-based operating systems using browsers such as Mozilla.

30.    I reviewed PayPal, Inc. records for the Venmo account associated with islandsmademe@gmail.com.  The account user information listed **TRUJILLO'**s name and the address for the

Inglewood apartment.  Venmo transaction records for the
islandsmademe@gmail.com account indicated that transfers to an
account associated with **CUMMINGS** represented the majority of the
account activity.  I reviewed PayPal, Inc. records for that
account, which listed **CUMMINGS**'s name, her social security
number, and phone number 310-220-5502 -- the phone number
registered to **CUMMINGS** and used to call FabFitFun, as discussed
above.

31.  Based on my background, training, and experience
investigating financial crimes, I am aware that fraudsters often
register email addresses using fake or incorrect names -- such
as Donald Duck -- in attempts to disguise their true identities.
I am further aware, however, that these fraudsters will at times
then associate such email addresses with accounts for other
digital services (i.e., Venmo, PayPal, Inc. and Square, Inc.
accounts) in their true names as well as for personal
correspondence (i.e., with the California EDD and property
management companies).  Based on my review of the information
associated with islandsmademe@gmail.com, I believe that **CUMMINGS**
and **TRUJILLO** both use the account, including in furtherance of
the Subject Offenses.

**F.   Surveillance of the SUBJECT PREMISES**

32.  On December 7, 2021, HSI conducted surveillance at the
**SUBJECT PREMISES**.  At approximately 08:00 am, I observed
**TRUJILLO** walk out of the residence with a large dog on a leash
and re-enter the residence a few minutes later.  At
approximately 08:10 am, I saw **TRUJILLO** exit the **SUBJECT PREMISES**

once again – this time with a young male child, walking westbound.

33.   Later that same day, I spoke to a United States Postal Service mail carrier who was assigned to the area.  I showed the mail carrier photos of **TRUJILLO** and **CUMMINGS** who the mail carrier recognized as the current residents of the **SUBJECT PREMISES**.  The mail carrier stated that both **TRUJILLO** and **CUMMINGS** regularly received mail at the **SUBJECT PREMISES** and that the mail carrier last spoke to **CUMMINGS** around October 2021.  The postal carrier also stated he left any packages addressed to **CUMMINGS** and **TRUJILLO** by the front door of the **SUBJECT PREMISES.**

### G.   CUMMINGS Has Previously Attempted to Link Several Stolen Credit Card Numbers to her Square Account

34.   I reviewed Square, Inc. records for an account registered to **CUMMINGS**.  The account records list the **SUBJECT PREMISES** as **CUMMINGS**'s address of record and the Inglewood apartment as her prior address.  Those records also note that telephone number 310-220-5502 was associated with the Square account between November 14, 2019, and December 27, 2020.

35.   The account records indicate that **CUMMINGS** attempted to link at least 16 credit cards -- nine AMEX, six Visa, and one Mastercard -- with the account, none of which were in the name of **CUMMINGS** or **TRUJILLO**.  But only three were successfully linked.  The other cards were blocked for card verification errors, entries of invalid zip codes, and/or by customer deny list rule.

36.   On December 1, 2021, an AMEX investigator informed me that each of the nine AMEX credit cards that were linked, or attempted to be linked, with **CUMMINGS**'s Square, Inc. account belonged to AMEX customers with VIP status, which is reserved for high-spending customers with large budgets.  The AMEX investigator added that each of the nine cards had also been used on at least one occasion at a point-of-sale terminal associated with Aloha Limousine Services in Los Angeles, California.

37.   Based on my investigation in this case, I believe that **CUMMINGS** obtained access to credit card numbers for customers of Aloha Limousine services through her employment and used, and attempted to use, those numbers without authorization, including S.C.'s AMEX as discussed above, and that evidence of this fraud scheme will be found in the **SUBJECT PREMISES** and on the persons of **CUMMINGS** and **TRUJILLO**, including digital devices belonging to CUMMINGS and TRUJILLO that were used to connect to the islandsmademe@gmail.com email account that was used in furtherance of the fraud scheme.

### V.   TRAINING AND EXPERIENCE REGARDING FRAUD OFFENSES

38.   Based on my training, experience, and consultation with other law enforcement officers, I am aware of the following:

a.   Individuals involved in fraud schemes usually keep evidence of their schemes, such as pay-owe sheets for dividing the proceeds, contact information for their co-conspirators, and records documenting the scheme so if an error

is made, they can recreate the documentation needed to help conceal the fraud.

b.    These individuals often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.

c.    Individuals involved in fraud schemes need to communicate with their co-schemers about their fraudulent activity.  There are usually records of those communications in their electronic devices such as cellular telephones.

d.    Typically, they maintain the evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles.  Such individuals commonly use digital devices to communicate with their fellow participants by phone, email and text messages.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Computers, tablets and cell phones can be used to communicate between co-conspirators and may contain information relating to the crime under investigation.

e.    I know from training and experience that individuals involved in fraud keep the most damaging evidence and/or proceeds of the scheme at their residences, vehicles, garages and to help conceal the fraud from their fellow coworkers who may have access to such documents at the workplace.  Proceeds such as cash and gifts are easier to

conceal at the fraudster's residence rather than in plain view of coworkers.  I also know that fraudsters will often hide disposable "burner" phones and other digital devices used to communicate with co-conspirators in locations other than their residences to further avoid detection from law enforcement.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

39.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

   b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **TRUJILLO**'s and/or **CUMMINGS**'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **TRUJILLO**'s and/or **CUMMINGS**'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

42.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

43.   For all the reasons described above, there is probable cause to believe that **CUMMINGS** has violated Title 18, United States Code, Section 1029(a)(2) (Use of an Unauthorized Access Device).

44.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the **SUBJECT PREMISES**, as described in Attachment A-1, and on the persons, including digital devices, of **CUMMINGS**, as described in Attachment A-2, and **TRUJILLO**, as described in Attachment A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  18th  day of
January_____ , 2022.


_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE